IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| COLUMBUS O. WINTERS, | : | CIVIL ACTION |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| UNITED STATES OF AMERICA, | : | |
| Defendant. | : | NO. 11-2692 |
| | : | |

**MEMORANDUM DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

**Baylson, J.**                                                                                          **April 5, 2012**

**I.     Introduction**

This case involves alleged medical malpractice at two Veterans Administration ("VA") medical establishments located in Philadelphia, occurring between December 17, 2007 and January 2, 2008, which allegedly harmed Plaintiff Columbus Winters ("Plaintiff"). Plaintiff's wife, Tawana Winters, brought this action against the United States of America ("the Government" or "Defendant") on behalf of her husband, pursuant to the Federal Torts Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b), 2671 et seq.

Specifically, Plaintiff alleges that while he was a patient at a VA medical facility, the VA medical practitioners ordered "an anticoagulant regimen of the drug Warfarin," "established a therapeutic range for safe anticoagulation for Plaintiff's medical condition at an International Normalized Ratio (hereinafter 'INR') between 2 and 3,"[1] and then failed to monitor Plaintiff's INR properly. Compl. ¶¶ 9-12. Plaintiff's unmonitored INR rose above the established safe

---

[1]     According to the Government, "INR stands for International Normalized Ratio. It is a laboratory test that measures the amount of time it takes for blood to clot, and it compares it to an average." Def. Br. at 2 n.3.

1

range, causing internal bleeding, aspiration of blood to the lungs, and a loss of oxygen to the brain.  Compl. ¶¶ 12-13.

Presently before the Court is the Government's Motion for Summary Judgment (ECF No. 16).  The Government argues that Plaintiff's claims are barred by the two-year statute of limitations.  As discussed below, the Court will DENY the Government's motion due to the genuine dispute of material fact as to when Plaintiff's claim accrued.

## II. Factual Background

The following facts are undisputed unless otherwise noted.[2]  Plaintiff was treated at the Veterans Administration Community Living Center in Philadelphia ("VACLC") and the Veterans Administration Medical Center in Philadelphia ("VAMC") (collectively, "the Centers") between December 19, 2007 and January 2, 2008.[3]  Def. SUF ¶ 1; Pl. SUF ¶ 1.  On January 2, 2008, Plaintiff was treated in the VAMC emergency room.  Def. SUF ¶ 5.  Soon thereafter, Dr. Bruce Kinosian, Plaintiff's treating physician, visited Plaintiff and had a conversation with Ms. Winters.  Def. SUF ¶¶ 5-7; Pl. SUF ¶ 5.

The subject of that conversation is disputed.  Compare Def. SUF ¶¶ 5-7, with Pl. SUF ¶¶ 5-7.  The Government submits a Declaration from Dr. Kinosian, in which he states that during

---

[2]  Defendants submitted a statement of undisputed facts ("Def. SUF") (ECF No. 17), to which Plaintiff responded ("Pl. SUF") (ECF No. 19).  Statements which an opposing party "disputed" were deemed undisputed for purposes of this Motion if the party's explanation of the dispute was non-responsive or failed to reference supporting evidence in the record.  See Fed. R. Civ. P. 56(c), (e).

[3]  Plaintiff was apparently also treated at a VA Medical Center on October 20, 2007 and had a stroke at that time. Pl. Dec. ¶ 5.  This is not the subject of the malpractice claim in this suit, but is relevant background for interpreting the evidence to determine the date on which Plaintiff's current claims accrued.

that conversation he "told Mrs. Winters that her husband had been over-anticoagulated and that we did not check his INR soon enough after the dose change to catch that he was still receiving a higher dose than he needed."

Ms. Winters denies that Dr. Kinosian spoke with her about the events leading to Plaintiff's admission to the emergency room. Pl. SUF. ¶ 6. She specifically denies that he ever mentioned that Plaintiff was "overanticoagulated" or that Plaintiff's INR was not properly monitored. Pl. SUF ¶ 7. In addition, she denies that Dr. Kinosian spoke with her in 2008 about Plaintiff's eligibility for VA benefits due to negligence or that Dr. Kinosian helped her obtain any such benefits for Plaintiff at that time. Pl. SUF ¶¶ 8-9. Ms. Winters also declares that when she asked VA employees why her husband was moved to the emergency room, she was told "he's old, and old people get sick" and "[h]e had another stroke." Pl. Dec. ¶ 9.

Ms. Winters submitted various claims for benefits for her husband but did not mention INR or over-anticoagulation until December 2009. On June 17, 2008, Ms. Winters submitted a "Veteran's Application for Compensation and/or Pension" on behalf of Plaintiff, in which she cites a "R side CVA"—which likely means right-sided cerebrovascular accident or what Plaintiff refers to as a "stroke"—beginning on October 18, 2007, among other disabilities. Pl. SUF ¶ 9; Decl. of Tawana Winters ("Pl. Dec.") ¶ 19; Pl. Ex. A. The Disabled American Veterans, representing Plaintiff, later amended that claim to include "entitlement to service connection for complications, inpatient hospitalization and treatment from October 2007 through April 27, 2009 under the provisions of Title 38 U.S.C. § 1151."[4] Pl. Dec. ¶ 20; Pl. Ex. E. The Department of

---

[4] 38 U.S.C. § 1151 provides, <u>inter alia</u>, compensation for veterans whose "disability or death was caused by hospital care, medical or surgical treatment, or examination furnished the veteran . . . in a Department facility . . . and the proximate cause of the disability or death was . . .

Veterans Affairs denied Plaintiff's claim for "complications of inpatient hospitalization due to stroke." Pl. Dec. ¶ 22; Ex. 9.  The Disabled American Veterans filed a Notice of Disagreement on December 7, 2009, which Ms. Winters believes prompted them to ask Dr. Kinosian for help. Pl. Dec. ¶ 23; Ex. G.  Dr. Kinosian wrote a progress report on December 8, 2009, in which he provides the explanation for Plaintiff's injuries that forms the basis of Plaintiff's claims in this case.  Dr. Kinosian states that giving Plaintiff Coumadin—which the Complaint states is part of an anticoagulant regimen—"was related to his current disabilities and the cost of his care being incurred by his wife." Compl. ¶ 9; Pl. SUF ¶ 23; Pl. Ex. E.  Dr. Kinosian then explains:

> [Plaintiff's] elevated INR was the cause of his bleeding into his stomach, which resulted in his vomiting blood, subsequent aspiration of the blood, and inflamation in his lungs from the aspirated stomach contents, causing the loss of oxygen to his brain and subsequent anoxic brain injury.  His current disabilities are a result of that anoxic brain injury.  Prior to his anoxic brain injury, he was recovering from his CVA, and was able to stand and take several steps, and more meaningfully interact with those in his environment.  He is now bed-bound and totally dependent.  The elevated INR was a consequence of his level of anticoagulation not being able to be successfully monitored during the 3 weeks prior to his bleeding, although several providers ordered that the level be checked.  The case was reviewed, and found to be an unexpected outcome of the care Mr. Winters received.

Pl. Ex. C.  Another doctor then examined Plaintiff and confirmed Dr. Kinosian's description of Plaintiff's injuries and their cause. Pl. Dec. ¶ 24; Pl. Ex. I.  The VA then approved Plaintiff's request for benefits.  Pl. Dec. ¶ 24; Pl. Ex. D.

   Ms. Winters also made a number of other complaints about the care or treatment her husband

---

carelessness, negligence, lack of proper skill, error in judgment, or similar instance of fault on the part of the Department in furnishing the hospital care, medical or surgical treatment, or examination . . . ."

received.  Def. SUF ¶ 10; Pl. SUF ¶ 10.  The ER attending note from January 2, 2008 states that Ms. Winters was "upset about [her husband's] care at the [nursing home] and wishes that he does not return there when he is discharged." Def. SUF ¶ 11; Pl. SUF ¶ 11.  Notes in February 2008 indicate that Ms. Winters "does not want [her husband] to go back to the VANH [also known as the VACLC]" and "wants [her husband] at a new nursing home because she was dissatisfied with the treatment he received at the VANH."  Def. SUF ¶ 12; Pl. SUF ¶ 12.  Other notes document Ms. Winters's belief that "the VA should pay for 24 hour care as her husband's medical condition was a result of his care at the PVMAC and VANH."  Def. SUF ¶ 13; Pl. SUF ¶ 13. Ms. Winters furthermore indicated her desire to place "a claim with the nursing home given her concerns about previous care that [her husband] received there."  Def. SUF ¶ 14; Pl. SUF ¶ 14.

Ms. Winters also met with the VAMC's Risk Manager. Def. SUF ¶¶ 116-18; Pl. SUF ¶¶ 16-18.  The Risk Manager gave Ms. Winters a brochure entitled "Financial Compensation After an Injury."  Def. SUF ¶ 18; Pl. SUF ¶ 18.  The Risk Manager also provided an administrative tort form, which Ms. Winters filed with the VA on June 8, 2010. Def. SUF ¶ 20; Pl. SUF ¶ 20.  Ms. Winters maintains that in speaking with the Risk Manager, she was motivated by her belief "that the harm caused by the VA to her husband was the harm caused by the strokes and she did not know and she was not told by any medical provider in 2008 that her husband ha[d] suffered brain damage as a result of being overanticoagulated, resulting in vomiting and aspiration of the vomit and subsequent reduction in oxygenation of his brain resulting in brain injury."  Pl. SUF ¶¶ 16-17.

Ms. Winters does not deny that she made frequent complaints about the care her husband received.  She admits that she "blamed the VA for [her] husband's two strokes" and complained

about the treatment her husband received—a mis-diagnosis that he needed a pacemaker, his bed sores, a lack of bathing, a hole in her husband's arm caused by a poorly placed IV, and a nurse sitting on her husband's pillow and playing with his food. Pl. Dec. ¶¶ 11, 16, 17, 18.

Ms. Winters also met with the VA Office of Regional Counsel. Def. SUF ¶ 19; Pl. SUF ¶ 19; Pl. Dec. ¶ 19. She also consulted a private attorney, who, in an April 14, 2009 letter declining to represent her, noted that "while you talked about potential deviations in the standard of care dating back several years, your chief concern was over potential negligence which occurred in October of 2007. Pl. Ex. B. Ms. Winters declares that the attorney told her that her husband's medical records "only showed that he had a stroke and 'anybody can have a stroke.'" Pl. Dec. ¶ 11.[5]

Ms. Winters states that she did not learn of the VA's failure to monitor Plaintiff's INR until January 2010, and did not learn until the spring of 2010 that the VA's failure to administer Vitamin K and oxygen to Plaintiff while he waited in the emergency room further harmed his brain. Pl. Dec. ¶¶ 12-13.

### III. The Parties' Contentions

The Government maintains that a party alleging malpractice under the FTCA must present an administrative claim within two years after the cause of action accrues. Def. Br. at 6. The Government argues that Plaintiff's claim accrued in January 2008. Def. Br. at 7. At that time, Ms. Winters knew both of Plaintiff's injuries and that they were caused by the VAMC's failure to check his INR. Def. Br. at 7. These facts would "enable a reasonable person to

---

[5] Although these statements may be privileged communications, they appears in the record without objection.

discover the alleged malpractice." Def. Br. at 7 (quoting Green v. United States, 180 F. App'x 310, 312-13 (3d Cir. 2001)).  She knew this because Dr. Kinosian told her that Plaintiff had been "over-anticoagulated" and that the VAMC did not properly monitor Plaintiff's INR, causing his injuries. Def. Br. at 7.  Moreover, the Government argues, Ms. Winter's knowledge of these facts is confirmed by her subsequent behavior, including her complaints, filing for benefits, going to the risk management office, and inquiring about filing a claim against the VA.  Def. Br. at 7-8.  The Government contends that because Ms. Winters did not submit an administrative claim on Plaintiff's behalf until June 2010, more than two years after Plaintiff's claim accrued, Plaintiff's claim is time-barred.  Def. Br. at 8-9.

Plaintiff responds that summary judgment is not appropriate because there is a genuine dispute of material fact regarding when Ms. Winters knew, or reasonably should have known, of the cause of Plaintiff's injury.  Pl. Br. at 6.  Ms. Winters denies that Dr. Kinosian told her in January 2008 that her husband had been over-anticoagulated and that the hospital failed to monitor his INR.  Pl. Br. at 3, 6, 8.  While Ms. Winters admits that she complained about the treatment her husband received at the Centers, she maintains that she thought a stroke caused her husband's injuries, rather than the VA's failure to monitor his INR, and points out that none of her complaints or administrative filings mention anything about over-anticoagulation or INR until Dr. Kinosian submitted his progress report. Pl. Br. at 9-10.

The Government replies that Ms. Winters cannot escape the statute of limitations problem merely because she lacked the medical sophistication to understand the science behind the cause of Plaintiff's brain injuries. Def. Reply at 2.  The Government contends that "[a]ll that was required for plaintiff's claim to accrue was a general understanding that medical practitioners

7

caused Mr. Winters' injuries, which is what Mrs. Winters had." Def. Reply at 3. The Government argues that Ms. Winters's complaints demonstrate that she believed the VA medical practitioners caused her husband's injuries, including those he suffered on January 2, 2008, and moreover that a reasonable person in her shoes should have had that same belief. Def. Reply at 3-5, 8.

## IV. Legal Standards

### A. Jurisdiction

This Court has jurisdiction over Plaintiff's claim against the United States pursuant to 28 U.S.C. § 1346(b), 2671 et seq.

### B. Standard of Review

A district court should grant a motion for summary judgment if the movant can show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).[6] A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A factual dispute is "material" if it "might affect the outcome of

---

[6] Amendments to Federal Rule of Civil Procedure 56 became effective on December 1, 2010. The oft-cited summary judgment standard formerly found in Rule 56(c) is now located in Rule 56(a), with one alteration: substitution of "dispute" for "issue." Fed. R. Civ. P. 56(a). The Rules Advisory Committee explained that this alteration better describes the summary judgment inquiry but does not affect the substantive standard or the applicability of prior decisions construing the standard. Fed. R. Civ. P. 56 Advisory Committee's note.
  Pursuant to 28 U.S.C. § 2074(a) and the April 28, 2010 Supreme Court order approving the amendments, the amended version of Rule 56 governs all proceedings commenced on or after December 1, 2010, and all proceedings then pending, "insofar as just and practicable." Defendant filed its Motion after December 1, 2010. Accordingly, when necessary, the Court quotes the Rule's new language.

the suit under the governing law." Id.

Where the non-moving party bears the burden of proof on a particular issue at trial, the moving party's initial burden can be met simply by showing the district court that "there is an absence of evidence to support the nonmoving party's case." Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). The party opposing summary judgment must rebut by making a factual showing "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Id. at 322. The district court may grant summary judgment "[i]f the evidence is merely colorable, or is not significantly probative." Anderson, 477 U.S. at 249 (internal citations omitted). Under Rule 56, the Court must view the evidence in the light most favorable to the non-moving party and draw all justifiable inferences in favor of the non-movant. Id. at 255 (citing Adickes v. S. H. Kress & Co., 398 U.S. 144, 158-59 (1970)).

**V.     Discussion**

A tort claim asserted against the United States under the FTCA "is barred unless it is presented in writing to the appropriate federal agency 'within two years after such claim accrues.'" United States v. Kubrick, 444 U.S. 111, 113 (quoting 28 U.S.C. § 2401(b)). "The time at which a claim "accrues" within the meaning of the FTCA is a matter of federal law." Green v. United States, 180 F. App'x 310, 312 (3d Cir. 2006) (citing Ciccarone v. United States, 486 F.2d 253, 256 (3d Cir. 1973)). Unlike most claims under the FTCA, the statute of limitations in a medical malpractice action "is tolled until the putative plaintiff possesses facts which would enable a reasonable person to discover the alleged malpractice." Hughes v. United States, 263 F.3d 272, 275 (3d Cir. 2001) (quoting Barren by Barren v. United States, 839 F.2d 987, 99 (3d

Cir. 1988) (internal quotation marks omitted)); see also Kubrick, 444 U.S. at 120 ("[T]he general rule under the Act has been that a tort claim accrues at the time of the plaintiff's injury."). The Supreme Court in Kubrick concluded that "once the plaintiff knows 'the critical facts that he has been hurt and who has inflicted the injury,' he can seek medical and legal advice to determine whether the medical care was substandard and whether he has a viable cause of action for negligence." Hughes, 263 F.3d at 275-76 (quoting Kubrick, 444 U.S. at 122). Consequently, under Kubrick, "a malpractice claim accrues when a patient knows the physical cause of a bad result, even without confirmation that the injury was the result of malpractice." Green, 180 F. App'x at 313 (citing Kubrick, 444 U.S. at 122). In Hughes, however, the Third Circuit "made a distinction between affirmative, albeit negative, treatment, as in Kubrick"—where the administration of a particular drug caused the plaintiff to lose hearing—"and injuries that are the result of the failure to diagnose or treat . . . ." Green, 180 F. App'x at 313-14 (citing Hughes, 263 F.3d at 267-77). Moreover, because the statute of limitations is an affirmative defense, "it is the defendant's burden to establish the date when the plaintiff knew, or reasonably should have known, of the cause of his injury." Hughes, 263 F.3d at 278.

In Hughes, the Third Circuit vacated the district court's order dismissing the case on statute of limitations grounds. Id. at 278. The plaintiff in Hughes was admitted to a VA medical center for surgery. Id. at 273. In preparation for the surgery, the VA medical practitioners administered the blood-thinning drug heparin. Id. Over the course of the week that plaintiff received heparin, his limbs filled with gangrene, causing the hospital to amputate his hands and legs. Id. at 274. When the plaintiff regained consciousness, the doctors told him that he had an allergic reaction to the heparin, which caused the gangrene and forced them to amputate. Id. The

VA medical practitioners did not tell the plaintiff, however, that his reaction could have been treated if they had timely diagnosed it. Id. The Third Circuit rejected the district court's holding that the plaintiff's claim accrued when the doctors told him the allergic reaction caused his amputations. Id. at 276. The Third Circuit explained that "[the plaintiff] was not provided any information that should have led him to believe that it was the failure to treat timely the allergic reaction to the heparin that caused the formation of gangrene." Id. In light of the doctors' failure to diagnose the plaintiff, the Third Circuit determined that "[t]he issue of accrual . . . depends upon when and if plaintiff discovered or through the exercise of reasonable diligence should have discovered that the failure of his doctors to diagnose, treat, or warn him led to his deteriorating condition." Id. at 277 (quoting Augustine v. United States, 704 F.2d 1074, 1076 (9th Cir. 1983)). The Third Circuit relied on the Seventh Circuit's conclusion that "[w]hen there are two causes of an injury and only one is the government, the knowledge that is required to set the statute of limitations running is the knowledge of the government cause [failure to diagnose]. . . ." id. at 277 (quoting Drazan v. United States, 762 F.2d 56, 59 (7th Cir. 1989)). The Third Circuit determined that, upon discharge, the plaintiff in Hughes had no reason to know of the government cause of his injuries. Id. at 278. In view of this, the Third Circuit concluded that there was a "material conflict" as to when the plaintiff "became or reasonably should have become aware of the cause of his injury," and held that summary judgment was therefore inappropriate. Id.

More recently, in Green v. United States, a panel of the Third Circuit applied Hughes and reversed the district court's grant of summary judgment for the government on statute of limitations grounds. 180 F. App'x at 312, 316. There, the plaintiff underwent hip replacement

surgery at a VA medical center. Id. at 310-11. Soon after surgery, the plaintiff's hip dislocated and he was in considerable pain, which endured for years, but was repeatedly told by the VA doctors that his symptoms were normal. Id. at 311. It was not until roughly two and a half years after surgery that a doctor informed the plaintiff that his hip dislocation was caused by a VA doctor incorrectly positioning his prosthesis. Id. at 311-12, 316. The district court found that the plaintiff's claim accrued before the point at which he was specifically told of the doctor-cause of his pain because the plaintiff's injury was apparent before that time and the plaintiff complained to doctors outside of the VA before that time. Id. at 315. The Third Circuit reversed, finding that the plaintiff had no reason to suspect that his injury was caused by the VA doctors until he was told as much. Id.

Like the plaintiffs in Hughes and Green, Plaintiff alleges that his injury was caused by a failure to diagnose and treat, rather than affirmative conduct. Plaintiff does not allege that it was negligent to administer the anticoagulant drug in the first place, but rather that the VA medical practitioners subsequently failed to monitor his INR properly. Although the Government does not concede that this was the cause of Plaintiff's injuries, and the Court need not rule on it here, it must be noted that there is compelling evidence in the record—including the declaration of Dr. Kinosian, which the Government submitted—that this alleged failure was indeed the cause of Plaintiff's injuries. Therefore, the standard set forth in Hughes will dictate when Plaintiff's claim accrued.

Viewing the evidence in the light most favorable to Plaintiff, there is a genuine dispute of material fact as to when Plaintiff, or Ms. Winters acting on his behalf, knew or should have known that this failure to monitor Plaintiff's INR caused his grave injuries. Although Dr.

Kinosian declares that explained exactly this to Ms. Winters in January 2008, Ms. Winters specifically denies this.  While the Government is correct that Ms. Winters need not understand the specific science behind the cause of the injuries for the claim to accrue, Kubrick, 444 U.S. at 118, Ms. Winters has denied that Dr. Kinosian told her anything about what led to Plaintiff's being admitted to the emergency room.  The Court, at trial, could therefore conclude that Dr. Kinosian did not discuss the cause of Plaintiff's injuries with Ms. Winters.  Furthermore, the fact that Ms. Winters made complaints about the care her husband received, filed for benefits, and consulted an attorney, does not necessarily belie her statements about her conversation with Dr. Kinosian because none of the complaints, benefits applications, or attorney conversations reference over-anticoagulation or INR until after Dr. Kinosian wrote his 2009 progress note.  At trial, the Court could find, therefore, that Ms. Winters was simply upset in general about the care her husband received, that he had two strokes while under VA care, and that he suffered serious injuries.  This conclusion is buttressed by Ms. Winters's explanation of the many things that concerned her about her husband's care at the Centers.  The Court could also conclude, at trial, that the VA medical practitioners mislead Ms. Winters by telling her that her husband simply "had another stroke."  In view of this genuine dispute of material fact, the Court holds that the Government has not met its burden and summary judgment is inappropriate.

### VI.     Conclusion

For the foregoing reasons, the Court will DENY Defendant's Motion for Summary Judgment.  An appropriate order follows.

O:\CIVIL 11-12\11-2692 Winters v. United States\Winters v US SJ MEMO.wpd